**E-FILED**

Wednesday, 03 October, 2007  08:46:49 AM

Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

|  |  |  |
|---|---|---|
| MICHAEL JAN YARBROUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-cv-4096 |
| v. | ) | |
| | ) | |
| JOANNE B. BARNHART, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

### O R D E R

Before the Court are Plaintiff's Motion for Summary Judgment [Doc. 10] and accompanying Memorandum [Doc. 10, Ex. 1] and Defendant's Motion for Summary Affirmance [Doc. 13] and accompanying Memorandum [Doc. 14].  For the reasons set forth below, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Affirmance is GRANTED.

### I.
### BACKGROUND

Plaintiff was 52 years old when he applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on December 2, 2002.  (R. at 54, 180.)  He alleged he was entitled to benefits because of an amputation of his left forearm below the elbow, hypertension, and a mood disorder.  (R. at 180-81.)

Plaintiff's applications were denied at both the initial and reconsideration stages of review. (R. at 27-31, 35-38, 182-89.)  Plaintiff then asked for consideration by an Administrative Law Judge ("ALJ").  (R. at 39.)  On October 20, 2004, ALJ Lawrence D. Wheeler heard Plaintiff's case (R. at 192-229) and denied the claim on January 12, 2005 (R. at 16-21).  An appeal was taken and the Appeals Council denied review of the ALJ's judgment on October 18, 2005 and that became the final decision of the Commissioner.  (R. at 4-10.)

The record before the Court demonstrates that Plaintiff had both physical and mental difficulties leading to his alleged disability.  With regard to Plaintiff's physical limitations, Plaintiff first fractured his right ankle in 1979. Later, his left forearm was amputated in 1997 because of an arterial occlusion and the onset of gangrene.  (R. at 140.)  The record shows that he currently uses a prosthetic arm.

With regard to his mental difficulties, on November 16, 2002, Plaintiff admitted himself to a psychiatric unit in Key West, Florida, for symptoms of depression and vague suicidal thoughts.  (R. at 107.)  He was voluntarily dismissed from the psychiatric unit four days later.  (R. at 118.)  The record shows that during his stay, Plaintiff was angry and depressed about his loss of employment, living situation, and the fact that he had not received a repaired prosthesis.  (R. at 118.)

During his 4-day hospitalization, he was treated with Zoloft, participated in social programs, was cooperative and rational, and gradually improved and became less angry. (R. 118-19.)  He was discharged at his own request, and, at the time of discharge, there was no evidence of suicidal thoughts. (R. 119.)

Plaintiff next underwent an evaluation by a Dr. Massick for fatigue, hypertension, and syncopal-like episodes[1] on December 16, 2002, and again on January 6, 2003.  (R. at 133-39.) Plaintiff complained of falling off his bike, feeling weak, and feeling unable to move.  (R. at 136.)  He said that sometimes he drank before these symptoms occurred.  (R. at 136.)  During his evaluations, Dr. Massick determined that Plaintiff's blood pressure was high, but that his other tests were completely normal.  (R. at 134.)

On January 11, 2003, a Dr. Biale gave Plaintiff a consultative exam in which he found that Plaintiff had hypertension within the normal limits.  And, his fractured right ankle had recovered to the point that he had a full range of motion.  (R. at 140-43.)

Later that month, a Dr. Bergmann reviewed Plaintiff's available medical record and determined his residual functional

---

[1] Syncopal episodes are characterized as a brief loss of consciousness associated with transient cerebral anemia, as in a heart block, sudden lowering of blood pressure.  Dorland's Illustrated Medical Dictionary 1628 (27th ed. 1988).

capacity ("RFC")[2].   (R. at 144-51.)   Dr. Bergmann concluded that
Plaintiff could sit or stand for about six hours in an eight-
hour work day. (R. at 145.)   Dr. Bergmann also found that
Plaintiff could occasionally lift twenty pounds and frequently
lift ten pounds and that Plaintiff had no communicative
limitations. (R. at 146, 148.)

    On April 26, 2003, Plaintiff was evaluated by a Dr.
Singley, a licensed clinical psychologist, at the request of the
Social Security Administration.  (R. at 152-55.)  Dr. Singley
noted that Plaintiff had an "anxious and somewhat depressed"
mood and tended to "overtalk most subjects."  (R. at 152-53.)
Dr. Singley also stated that it was somewhat difficult for
Plaintiff to stay focused, although he seemed to have a normal
level of intelligence.  (R. at 154.)  Dr. Singley concluded that
Plaintiff had a mood disorder because of his physical problems,
depression and anxiety with "possible major depressive-like
episodes periodically," as well as problems with his attention
and concentration.  (R. at 155.)

    Lastly, Plaintiff visited a Dr. Feria five different times
between July 2003 and August 2004.  (R. at 163-79.)  Plaintiff
first saw Dr. Feria on July 21, 2003, and at that visit was put

---

[2] Residual functioning capacity is defined as the most a person
is able to do despite their limitations based on all of the
relevant evidence found in the case record.  20 C.F.R. §
404.1545(a)(1).

on Maxzide in order to help with his hypertension.  (R. at 173.)
Plaintiff denied any shortness of breath, chest pain or headache
at that visit, but mentioned that he sometimes woke up with
stiff feet.  (R. at 173.)  Plaintiff's next visit to Dr. Feria
was on March 16, 2004.  The purpose of the visit was to request
refills for Maxzide, which he had run out of one month before.
(R. at 171.)  In addition, the record indicates that Plaintiff
had no specific complaints at this visit.  (R. at 171.)  Dr.
Feria noted that Plaintiff had a history of medical
noncompliance and put him back on Maxzide.  (R. at 171.)

On April 16, 2004, Plaintiff had his third visit with Dr.
Feria where again he had no complaints.  (R. at 169.)  Dr. Feria
noted that he continued to have hypertension and was
experiencing some fatigue and shortness of breath when walking
uphill, but not when walking on a flat surface.  (R. at 169.)

Plaintiff's fourth visit to Dr. Feria was on June 22, 2004
and he had no specific complaints at that time either.  (R. at
167.)  Dr. Feria proscribed Lipitor for Plaintiff's cholesterol
problem at this visit and scheduled a meeting two months from
then to check on the medication's effect.  (R. at 167.)

Plaintiff's last visit with Dr. Feria was on August 23,
2004 and at that visit he specifically complained of chronic
fatigue and "a white bump under his eye."  (R. at 164.)
Plaintiff also admitted that he had not taken the Lipitor

prescribed to him because he had heard too many bad things about the drug.  (R. at 164.)  At this visit, Dr. Feria noted that Plaintiff was "a well-developed and well-nourished male in no apparent distress."  (R. at 164.)  Dr. Feria also found that Plaintiff's blood tests were normal, but that the hypertension remained "suboptimal."  (R. at 164.)  This was Plaintiff's last visit to a doctor before his administrative hearing.

At the October 20, 2004 administrative hearing before the ALJ, Plaintiff testified to the following:  He was right-hand dominant and his left arm was amputated below the elbow in 1997. (R. at 195.)  He had worked substantially after his left arm was amputated but Plaintiff believed he was now unable to work due to fatigue, pain in his legs and arms, and depression.  (R. at 195-96.)  Plaintiff also mentioned that his blood pressure was bad and that it sometimes affected his ability to work because he gets dizzy when it fluctuates.  (R. at 204.)  Plaintiff stated that he last worked full-time in July, 2002 as a line cook and has worked only a couple of weeks since then.  (R. at 200-02.)

Plaintiff was asked by the ALJ why he did not complain to Dr. Feria about his alleged conditions during his checkups with her in 2003 and 2004.  He testified that he did not complain because his medical coverage at that time did not allow him "to go any farther with her."  (R. at 209.)

Plaintiff further testified about numerous conditions that he had not discussed with his doctors.  He stated that he could stand on his feet for only three hours at a time before he needed to rest and that he could not stand regularly for six hours out of an eight hour workday without pain.  (R. at 211.)  And, he testified that he could lift a maximum of twenty pounds by using both his right hand and his prosthesis on his left arm.  (R. at 213.)  However, Plaintiff mentioned that his prosthesis was not working properly at the time of the hearing and that it might fall off when he tried to lift something ten pounds or more.  (R. at 214.)  Plaintiff also mentioned that he occasionally gets muscles spasms in his left shoulder, which last from ten to forty-five minutes.  (R. at 217.)  According to Plaintiff, the spasms are periodic and sometimes are absent for two or three days.  However, when they return, he can do nothing but massage his arm.  (R. at 218.)

When questioned about his fatigue, Plaintiff testified that he regularly has interrupted sleep - up to five days a week - which affects his energy level and makes him tired the day after.  (R. at 215-16.)  Plaintiff also stated that he needed to take one to two hour naps during three to five days out of the week.  (R. at 216.)  Regarding his level of focus, Plaintiff testified that he has sometimes had trouble with his concentration at home and at work.  (R. at 216.)  He also

7

testified that he has occasionally blacked-out, but never told a
doctor about his blackouts.  (R. at 218-19.)

Asked by his attorney why he could no longer work,
Plaintiff said that he did not have the stamina anymore.  (R. at
219.)  Plaintiff testified that he would have a problem standing
more than six hours a day and would also have a problem lifting
twenty pounds.  (R. at 219.)  At the hearing the ALJ proposed a
hypothetical to a vocational expert ("VE"), Ronald Atakiama.
(R. at 224.)  This hypothetical did not include any mental
impairments, but assumed that Plaintiff was physically impaired
as found by the RFC evaluation of Dr. Bergmann.  (R. at 224.)
Under the hypothetical, the VE testified that Plaintiff would be
able to perform his past work as a cook.  (R. at 225.)
Plaintiff's lawyer then proposed a different hypothetical in
which a person had to lay down three to five times a week during
the day because of fatigue.  (R. at 226.)  The VE testified that
under this hypothetical a person would not be able to work.  (R.
at 226.)  The VE was then asked whether a person would be able
to work with the type of spasms that Plaintiff testified he
suffered.  (R. at 226.)  The VE stated again that such a person
would be unable work.  (R. at 226.)  Lastly, when asked about a
person with the concentration difficulties that Plaintiff
testified he suffered, the VE stated that such a person would be

unable to perform the duties of Plaintiff's past work as a cook. (R. at 229.)

## II.
## LEGAL STANDARD

In order to be entitled to disability benefits under the Social Security Act, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled.  Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits.  See 20 C.F.R. §§ 494.1566, 416.966 (1986).

The establishment of disability under the Social Security Act is a two-step process.  First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42. U.S.C. § 1382(c)(a)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980).  That factual determination is made by using a five-step sequential test.  See 20 C.F.R. §§ 404.1520, 416.920.

9

The five-step sequential test is examined by the ALJ in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or equal one on the list of specified impairments?  (20 C.F.R. Part 404, Subpart P, Appendix 1): (4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled.  Garfield v. Schwerkis, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burden of production and persuasion on steps 1 through 4.  However, once the plaintiff shows an inability to perform past work, the burden shifts to the commissioner to show an ability to engage in some other type of substantial gainful employment.  Tom v Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's findings with the Court's own assessment of the evidence.  The Court must only determine

whether the ALJ's findings were supported by substantial
evidence and whether the proper legal standards were applied.
Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  In
determining whether the ALJ's findings are supported by
substantial evidence, the Court must consider whether the
record, as a whole, contains "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).
Credibility determination made by the ALJ will not be disturbed
unless the finding is clearly erroneous.  Anderson v. City of
Bessemer City, 470 U.S. 564 (1985).

### III.
### THE ALJ'S DECISION

The ALJ issued an opinion on January 12, 2005, in which he
found that Plaintiff was not disabled for purposes of Sections
216(i) and 223 of the Social Security Act.  (R. at 21.)  In
making this decision the ALJ proceeded along the five step test
described above.  The ALJ first found in favor of Plaintiff at
steps one and noted that Plaintiff had not performed substantial
gainful activity since his alleged onset date. (R. at 18.)  At
step two, the ALJ considered whether Plaintiff's mental
impairments were considered "severe" based on the requirements
in the regulations.  (R. at 18.)  The ALJ found that there was
insufficient evidence to establish the existence of any severe

medically determinable mental impairment or combination of
impairments.  (R. at 18.)  However, the ALJ also considered
Plaintiff's impairments "from a physical standpoint."  (R. at
18.)  Here, the ALJ found that Plaintiff did have impairments
which are considered "severe" based upon the requirements in the
regulations and proceeded on to step three. (R. at 20.)

    At step three the ALJ found against Plaintiff and held that
Plaintiff's medically determinable impairments did not meet or
medically equal one of those listed in the regulations.  The ALJ
then continued on to step four and found against Plaintiff at
step four.  Specifically, the ALJ found that Plaintiff's
medically determinable impairments did not prevent him from
performing his past relevant work, and as a result, Plaintiff
was not entitled to benefits.

    In making this holding, the ALJ concluded that Plaintiff's
allegations regarding his limitations were not "totally
credible."  (R. at 21.)  Instead, the ALJ relied upon the
testimony of the vocational expert and concluded that Plaintiff
retained the residual functional capacity for his past relevant
work as a short order cook. (R. at 21.)

## IV.
## DISCUSSION

    Plaintiff makes three arguments for why the ALJ's decision
in this case should be overturned: (1) The ALJ did not take

proper account of Plaintiff's complaints of depression, pain, and fatigue; (2) The ALJ erred in its finding of Plaintiff's RFC; and (3) The ALJ contradicted himself when discussing the severity of Plaintiff's impairments.  This court will consider each of these arguments in order.

**1. Plaintiff's Complaints of Depression, Pain, and Fatigue.**

Plaintiff argues that the ALJ failed to consider his subjective complaints regarding depression, pain and fatigue. However, the ALJ specifically considered Plaintiff's complaints and found that they were not credible.  Specifically, the ALJ stated that Plaintiff's "allegations of severe and debilitating pain and fatigue are not entirely credible based upon the record when considered as a whole." (R. at 19.)  The ALJ also found that these complaints were not credible because Plaintiff's testimony as to his medical compliance was inconsistent with the medical reports written by Dr. Feria.  (R. at 19.)  An ALJ's credibility determination is given special deference and will not be reversed unless it is patently wrong.  Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000); Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

In this case, the ALJ's credibility determinations show no sign of error.  Specifically, the ALJ pointed out that Plaintiff rarely complained of these alleged ailments when he was being treated by doctors.  The record shows that Plaintiff did not

13

complain of depression or pain during his visits with Dr. Feria,
between July 2003 and August 2004.  (R. at 163-79.)  Moreover,
the record indicates that Plaintiff only complained of fatigue
during one of his five visits with Dr. Feria.  (R. at 164.)  And
even then, Dr. Feria it was not a credible complaint because Dr.
Feria did not find any "medically determinable impairment that
could reasonably be expected to cause the alleged symptoms."
(R. at 19.)

     Plaintiff allegedly did not want to inform Dr. Feria of his
other ailments because his medical coverage would not allow him
"to go any farther with her."  However, when Plaintiff had a
specific ailment, he did not hesitate to bring that to the
Doctor's attention.  Specifically, the record shows that
Plaintiff complained of a white bump under his eye during his
last visit with Dr. Feria on August 23, 2004.  (R. at 164.)  The
fact that Plaintiff made such a specific complaint indicates
that he would have likely complained of his other more serious
impairments such as depression, pain, and fatigue if he had
indeed been experiencing them during his earlier visits.
Consequently, the fact that Plaintiff did not complain of
depression or pain supports the ALJ's opinion that Plaintiff was
not entirely credible when he made such complaints later during
the administrative hearing.

Finally, Plaintiff testified at the hearing that he took his medication ninety-nine percent of the time. (R. at 205.) However, medical reports from Dr. Feria indicate that Plaintiff went for almost one and a half months without taking his medication over the course of his treatment. (R. at 171, 173.) While this evidence does not directly concern Plaintiff's alleged disabilities, the conflict between the report and the testimony does demonstrate that Plaintiff may have been less than truthful on the stand. Accordingly, the ALJ sufficiently articulated his reason for finding that Plaintiff's testimony regarding his condition lacked credibility. And, as this finding was not clearly erroneous, it will not be disturbed by this Court.

### 2.  Plaintiff's RFC.

At the fourth step of the five step test, the ALJ must consider an assessment of the claimant's RFC. The RFC is an assessment of what work-related activities the plaintiff can perform despite his limitations. Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir.2001); 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations.") The RFC must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1). When reviewing an ALJ's findings regarding a claimant's RFC, a district court shall affirm the decision of

15

the ALJ so long as it applied the correct legal standard and its
findings of fact were supported by substantial evidence.   42
U.S.C. § 405(g).   Substantial evidence is "such evidence as a
reasonable mind might accept as adequate to support a
conclusion."   Richardson, 402 U.S. at 401.

Plaintiff's first challenge to the ALJ's RFC finding is
that the ALJ only considered Plaintiff's physical capacity when
determining his RFC and did not take into account any of his
mental impairments.   This argument is without merit, however,
because the ALJ explicitly considered the evidence surrounding
Plaintiff's mental capacity. (R. at 18.)

Plaintiff's concern with the ALJ's decision springs from
the fact that the ALJ originally articulated all of the evidence
concerning Plaintiff's alleged mental issues at stage two of his
analysis.   At that point, the ALJ described the sparse nature of
the evidence regarding Plaintiff's mental impairments and held
that Plaintiff's mental impairments, considered alone, did not
allow Plaintiff to proceed on to steps three and four of the
test.   However, the ALJ then considered Plaintiff's physical
impairments in combination and allowed Plaintiff to proceed on
to step three and four based upon a consideration of the
physical disabilities.   Then, at step four the ALJ did not
restate all of the evidence regarding Plaintiff's mental
impairments.   Instead, the ALJ simply summarized Plaintiff's

16

allegations regarding his impairments and specifically included "insomnia/depression causing diminished stamina." (R. at 19.) The ALJ then went on to state the reasons why he did not consider Plaintiff's allegations credible which were discussed *supra*.

Now, Plaintiff argues that the ALJ did not consider Plaintiff's mental impairments. In this case, the ALJ described how there was minimal evidence supporting Plaintiff's mental impairments at the second stage of the analysis. However, he did not restate his reasons for rejecting that evidence at the forth stage of his analysis. Nevertheless, the ALJ is not required to restate every piece of evidence and why it is not sufficient at every stage of proceeding. Zblewski v. Schweiker, 732 F.2d 75 (7th Cir. 1984). Specifically, requiring an ALJ to discuss every piece of evidence at every stage of the analysis would be impractical and fruitless. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

More specifically, Plaintiff argues that the ALJ erred by relying upon the RFC determination because the RFC determination was made without considering Dr. Singley's mental exam. [Doc. 10 Ex. 1 at 9.] The ALJ specifically noted during the second step of the five step test that Dr. Singley had diagnosed Plaintiff with a "mood disorder due to various physical issues with depressive/anxious features and periodic major depressive

17

episodes causing attention/concentration deficits." (R. at 18.)
However, the ALJ did not rely upon this diagnosis because
Plaintiff had not complained of depression to any of his
physicians after he met with Dr. Singley.  Furthermore, the ALJ
noted that one stated reason for Plaintiff's depression was that
his prosthetic arm had been broken and emphasized that since
Plaintiff's arm was fixed there had been a lack of complaints.
(R. at 19.)

An ALJ may reject a doctor's opinion "if it appears to be
based on a claimant's exaggerated subjective allegations."
Dixon v. Massanari, 270 F.3d 1171 (7th Cir. 2001).  In this
case, the ALJ rejected Plaintiff's subjective allegations
regarding his mental impairments.  It then follows that he
rejected Dr. Singley's opinion because it was based upon
Plaintiff's exaggerated subjective allegations.  Once again, the
ALJ only provided this analysis during step two of the five step
test.  He did not restate his reason for dismissing Dr.
Singley's findings during the forth step of his analysis.
However, as noted *supra*, the ALJ is not required to restate his
reasons for dismissing each piece of evidence at each stage of
the analysis.

Finally, Plaintiff argues that the RFC finding was in error
because it was not based on a recent RFC evaluation.  Plaintiff

argues that a "recent" RFC evaluation is the only appropriate test for determining a plaintiff's RFC.

The Plaintiff's RFC evaluation occurred approximately one year before the administrative hearing.  The parties dispute whether Plaintiff or the ALJ is responsible for obtaining a more recent RFC evaluation.  While Plaintiff bears the burden of supplying records and evidence to prove his claim of disability, Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004), the ALJ is also required to develop the record and the arguments both for and against granting benefits.  See, e.g., Sims v. Apfel, 530 U.S. 103, 110-111 (2000).  However, "the primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." Flener ex rel. Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004). And, our Appellate Court has recognized that, because it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected. Luna v. Shalala, 22 F.2d 687, 692 (7th Cir. 1994).  As a result, if Plaintiff felt that a more recent RFC determination was needed to determine if Plaintiff was disabled, then Plaintiff has the burden of obtaining the necessary medical records.

Furthermore, the ALJ's decision to not seek an additional RFC evaluation was justified in this case.  Specifically,

19

Plaintiff does not point to any new evidence that arose after
the RFC evaluation that would materially change the RFC finding
(other than Dr. Singley's exam discussed *supra*).  [Doc. 10, Ex 1
at 9.]  Without any new evidence, Plaintiff has not persuaded
this Court that an additional RFC evaluation would make any
difference in the outcome of the hearing.  As a result,
Plaintiff has failed to show that the ALJ lacked substantial
evidence to reach his RFC determination.

### 3.  Plaintiff's Severe Impairments.

Plaintiff's final argument is that the ALJ contradicted
himself when discussing the severity of Plaintiff's impairments.
[Doc. 10, Ex 1 at 10.]  Specifically, Plaintiff points out that
the ALJ first held that there was "insufficient evidence to
establish the existence of any severe medically determinable
mental impairment or combination of impairments lasting for a
period of 12 months or more," but then later found that
Plaintiff's "depression related to physical impairments and
financial problems" was severe when considered in combination
with his other physical impairments.  See (R. at 18.)

In this case, at step two of the five step test, the ALJ
first considered Plaintiff's mental impairments separately and
then considered then considered Plaintiff's physical impairments
in combination with his "depression related to physical
impairments and financial problems."

The ALJ's decision to evaluate the mental and physical impairments separately was an error on the part of the ALJ.  20 C.F.R. § 404.1522 governs the process for evaluating separate and concurrent impairments:

> (a) Unrelated severe impairments. We cannot combine two or more unrelated severe impairments to meet the 12-month duration test. If you have a severe impairment(s) and then develop another unrelated severe impairment(s) but neither one is expected to last for 12 months, we cannot find you disabled, even though the two impairments in combination last for 12 months.
>
> (b) Concurrent impairments. If you have two or more concurrent impairments which, when considered in combination, are severe, we must also determine whether the combined effect of your impairments can be expected to continue to be severe for 12 months. If one or more of your impairments improves or is expected to improve within 12 months, so that the combined effect of your remaining impairments is no longer severe, we will find that you do not meet the 12-month duration test.

In this case, the ALJ decided to analyze Plaintiff's mental impairments separately from Plaintiff's physical impairments at step two of the analysis.  And, the ALJ concluded that Plaintiff's did not have a severe medically determinable mental impairment or combination of impairments that lasted for twelve months or more.  If the ALJ's analysis had ended at that point, then the ALJ would have committed reversible error.  Specifically, step two is a "de minimis screening device," and the ALJ is required to consider the combined effect of non-severe impairments at step two.  Johnson v. Sullivan, 922 F.2d 346, 347 (7th Cir. 1990).

However, the ALJ continued in his analysis and allowed Plaintiff to proceed past step two.  As a result, any error on the ALJ's part was harmless.  Errors, if harmless, do not require or permit a reviewing court to upset the agency's decision.  Sanchez v. Barnhart, 467 F.3d 1081, 1082 (7th Cir. 2006).

In this case, the ALJ first found that Plaintiff was not currently engaged in substantial gainful activity at step one. (R. at 18.)  The ALJ then considered the severity of Plaintiff's mental impairments at step two.  There, he explained his reasoning for discrediting that evidence and found that there was "insufficient evidence to establish the existence of any severe medically determinable mental impairment or combination of impairments lasting for a period of 12 months or more." (R. at 18.)  However, the ALJ proceeded and found that Plaintiff's physical impairments were severe when considered "in combination."  As a result, Plaintiff was able to proceed to the next step in the evaluation process.  (R. at 18.)  The fact that this part of the ALJ's opinion appears contradictory to Plaintiff did not stop Plaintiff from proceeding at that stage of the litigation.  As a result, any harm from the ALJ's allegedly faulty analysis was harmless and did not prevent Plaintiff from proceeding on to step four.

At step four, the ALJ considered all of Plaintiff's allegations in summary and in combination.  He did not need to restate his reasons for dismissing much of the evidence discussed earlier but summarized his conclusions and demonstrated that there was substantial evidence to support his conclusions.  While unartfully drafted, the ALJ's opinion still satisfies the requirement of presenting substantial evidence to support his conclusion.  Accordingly, this Court will not upset the ALJ's decision because of a harmless error.

## V.
### CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment is DENIED [Doc. 10], and the Defendant's Motion for Summary Affirmance is GRANTED [Doc. 13].  The decision of the ALJ is hereby AFFIRMED.

CASE TERMINATED.


ENTERED this  2nd  day of October, 2007.

                              s/Joe Billy McDade_____
                              Joe Billy McDade
                              United States District Judge